UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MOHAN THAMPI,

     Plaintiff,

v.                              CASE No. 8:07-CV-1445-T-TGW

MANATEE COUNTY BOARD
OF COMMISSIONERS,

     Defendant.

_____

## O R D E R

       The plaintiff alleges that his termination from his employment with Manatee County was in retaliation for exercising rights under the First Amendment and Title VII. The defendant has filed a motion for summary judgment as to the plaintiff's First Amendment and Title VII retaliation claims in counts II and III of his third amended complaint (Doc. 59). The plaintiff also filed a motion for partial summary judgment as to counts II and III (Doc. 60). Each retaliation claim has multiple deficiencies. Accordingly, the defendant's motion for summary judgment will be granted.

I.

The plaintiff, Mohan Thampi, was employed by the defendant, Manatee County Board of Commissioners ("County"), as projects and engineering division manager from July 6, 2004, until he was terminated on February 12, 2007 (Doc. 59, pp. 2, 13). The plaintiff was hired by, and reported directly to, Tim Hochuli, department director of the project management department ("PMD") (id., pp. 2-3). PMD is responsible for contract negotiations and engineering and construction projects, many valued from the millions to tens-of-millions of dollars, including capital improvement activity and various public maintenance and infrastructure projects (id., p. 2).

As projects and engineering manager, Thampi directed the largest division of PMD, overseeing 45 employees (id., p. 3). His department was responsible for the operational areas of project management, plan review, survey, locates, records, and engineering design (id., p. 4).

In July 2005, Thampi first received a negative performance evaluation from his director (Doc. 59-3, pp. 5-7). Hochuli concluded that Thampi, despite being given additional resources, was unable to decrease the

-2-

time taken for development review (id., p. 6). Thampi was evaluated again by Hochuli a year later, who determined that Thampi was performing to the minimal standards and failed to meet expectations in the managerial category (id., pp. 12-13). Among other things, Hochuli faulted Thampi for untimely responses, over-delegation of his workload, and the failure to establish deadlines for his staff (id., p. 12). Hochuli directed Thampi to outline a tracking plan to reduce the time for plan review and to establish deadlines for staff (id., p. 13).

Approximately one month after the July 2006 evaluation, Hochuli issued Thampi a warning for failure to provide "specific and accurate comments" and "to follow up on projects that were nearing their completion date" (id., p. 16). In addition, Thampi received a Notice of Disciplinary Action for insubordination because he had failed to establish development review deadlines and tracking for his staff (id., p. 19).

During this period, Thampi was also reprimanded several times for unprofessional behavior. After two prior oral warnings, Thampi, on December 22, 2005, was issued a written warning by Hochuli for tardiness and accessing internet sites for personal purposes (id., pp. 8-9). Two months

later, Hochuli formally disciplined Thampi for insubordination because he violated the County's computer policy again by visiting personal shopping and banking websites during duty hours (id., pp. 10-11). Hochuli felt that, "[a]s a high-level manager, [Thampi] must be expected to follow County rules, set a proper example for his and other employees and follow the instructions of supervisors without continuous follow-up. I must be able to trust that my instructions will be followed by the high-level managers reporting to me" (id., p. 10).

Approximately five months after Thampi's last discipline notice, Hochuli informed Thampi by pre-termination letter that he was being considered for termination due to, among other reasons, incompetence, insubordination, inefficiency, and for conducting personal business during duty hours (id., pp. 23-25). Thampi was placed on administrative leave on January 30, 2007, pending Hochuli's final decision (id., p. 25). Thampi requested time to compose a response to the charges, which he submitted on February 2, 2007 (id., pp. 26-33). Despite Thampi's eight-page rebuttal, the plaintiff was formally terminated on February 12, 2007 (id., pp. 48-53).

Thampi appealed that decision pursuant to County procedures and requested a post-termination hearing, which was conducted before a hearing officer on May 10-11, 2007 (id., p. 55). By an order dated July 18, 2007, the hearing officer recommended that the termination be upheld (id., pp. 55-62). The County Administrator adopted that decision two days later (id., p. 54).

The facts giving rise to this suit occurred two weeks before the January 30, 2007, pre-termination letter, when Thampi was named, unknowingly, as a witness in a fellow employee's internal discrimination complaint. Thampi contends that his inclusion on the witness list is the real reason he was terminated.

Specifically, Thampi's co-worker, Deloris Crockett, filed an internal complaint of discrimination on January 19, 2007, with the County's human resources ("HR") department (Doc. 59-4, pp. 7-8). Crockett, who is African-American, served as Hochuli's assistant until he changed her title and reassigned her to other duties (id., p. 24). Hochuli then replaced Crockett with his former assistant, Marlene Marlatt (id., pp. 25-26). Consequently, Crockett filed, internally, a complaint of discrimination with the County.

-5-

Before consulting with Thampi, Crockett named the plaintiff as one of four witnesses to her January 19th complaint (id., p. 8). On or about January 29, 2007, the day before the pre-termination letter was issued, Thampi spoke with Crockett for the first time about her complaint and agreed, somewhat reluctantly, to be a witness on her behalf (id., p. 21). However, it was not until February 2, 2007, that the County's HR department provided to Hochuli official notice that a discrimination complaint had been filed by someone in his department. That notice did not identify either the complainant or the subject of the complaint (id., pp. 14-15).

The County appointed an investigator to assess Crockett's internal discrimination complaint, and investigators questioned Thampi on March 1, 2007 (id., pp. 16-21). The investigator concluded that there was no evidence of race discrimination, but suggested that Hochuli should have given Crockett more time and specific feedback on her performance before changing her title and duties (id., p. 50). Crockett continues to work for the County as an administrative support coordinator (Doc. 59-12, p. 1).[1]

---

[1]Citations to depositions refer to the page numbers at the top of each electronically-filed page, and not to the numbers located within each page.

Pertinently, Hochuli is a Major in the Army Reserves. He was issued orders related to the Iraq War and ceased working for the County on May 29, 2007 (Doc. 59-7, p. 10). He did not return to work for the County until after August 2008 (id.).

Subsequently, Thampi filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), alleging that the real reason he was terminated was retaliation for, among other things, being named as a witness by Crockett (Doc. 59, p. 14). After receiving a right-to-sue letter, plaintiff filed this suit in federal court in August 2007 (id.).

Thampi talked with Jody Kirkman, Sarasota County's utilities planning and regulatory manager, about employment around September 2007 (Doc. 59-15, pp. 4, 5). Kirkman offered Thampi a position as technical specialist 13, conditioned on a background check (id., p. 4).[2] In connection with Thampi's background check, Kirkman spoke to Thampi's references, Manatee County utilities department director Dan Gray and utility manager

---

[2]The plaintiff avers that he was offered a job by Kirkman in April 2007, but that a hiring freeze prevented his employment (Doc. 60-9, p. 2). Kirkman advised the plaintiff four months later that the freeze was lifted (id., p. 3).

John Zimmerman (id., p. 6). Sarasota County also placed a public records request for Thampi's employment records from his previous employers, Manatee County and Collier County (id., pp. 4, 8).

Kirkman gathered the records and placed them, along with Sarasota's papers on Thampi, in one file (id., pp. 12-13). That file included a printout of a Google search, conducted on September 18, 2007, by an unknown individual, highlighting the plaintiff's current lawsuit against the defendant and a previous civil rights suit against Collier County (id., pp. 10, 11). After the background check was completed, Kirkman rescinded the offer of employment to Thampi (id., p. 4).

In this case, the parties have consented to the exercise of jurisdiction by a United States Magistrate Judge (Doc. 25). The case has proceeded to a third amended complaint that contains three counts (Doc. 39). Count I alleges a denial of procedural due process (id., p. 2). That count has been dismissed on the County's motion for summary judgment on the grounds that the plaintiff was afforded due process in connection with his termination, and that the claim was foreclosed by McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994)(en banc), cert. denied, 513 U.S. 1110 (1995).

Count II alleges First Amendment retaliation and count III alleges Title VII retaliation (Doc. 39). The defendant has filed a motion for summary judgment with regard to the plaintiff's remaining claims in counts II and III (Doc. 59). The plaintiff then filed a partial motion for summary judgment (Doc. 60). A hearing was subsequently held on the motions.

## II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

When the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the nonmoving party's case at trial, or, alternatively, it may come forward with "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991). If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id.

When the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

When the party moving for summary judgment has the burden of proof at trial, it must affirmatively show the absence of a genuine issue of

material fact by presenting credible evidence that would entitle it to a directed verdict if the evidence was not controverted at trial. Id. If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437-38. If the movant meets its initial burden, then it is entitled to summary judgment unless the nonmoving party comes forward with "significant probative evidence demonstrating the existence of a triable issue of fact." Id. at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. Id.

### III.

In count II, the plaintiff alleges that the County retaliated against him for exercising his right to freedom of speech (Doc. 39, pp. 5-9). It is well established that a public employer may not retaliate against an employee for

protected speech. Brochu v. City of Riviera Beach, 304 F.3d 1144, 1157 (11th Cir. 2002).

The plaintiff's claim has two aspects: (1) the termination of the plaintiff's employment; and (2) the alleged interference with the plaintiff's Sarasota job opportunity. Unfortunately, the plaintiff is vague about his alleged protected activities. Consequently, it is necessary to address alternative scenarios.

A. The County perceives the plaintiff's retaliation claim regarding his termination to be predicated upon Crockett's listing him on the County's discrimination complaint form as one of four witnesses (Doc. 59, p. 16). This is reasonable since count II of the third amended complaint does not specify any other alleged protected activity (see Doc. 39, ¶ 33). Moreover, in the response to the County's summary judgment motion, the plaintiff does not dispute that he is asserting such a claim (see Doc. 64, pp. 2-6).

However, as the County persuasively argues, when Crockett simply placed the plaintiff's name on a form, the plaintiff was not engaging in speech. The First Amendment guarantees individuals the right to engage

in speech, including expressive conduct. <u>See</u> <u>Texas</u> v. <u>Johnson</u>, 491 U.S. 397 (1989). Whether conduct is expressive is determined by whether the actor had an intent to convey a particularized message in his conduct, and whether a reasonable person would interpret the actor's conduct as conveying some message. <u>Holloman ex rel. Holloman</u> v. <u>Harland</u>, 370 F.3d 1252, 1270 (11th Cir. 2004). Moreover, "speech which has not yet occurred ..., for First Amendment retaliation purposes, is no speech at all." <u>Wernsing</u> v. <u>Thompson</u>, 423 F.3d 732, 752 (7th Cir. 2005).

Here, Thampi did not even attempt to speak about Crockett's complaint at the time it was filed because he was not aware of Crockett's complaint (Doc. 59-8, p. 15). Consequently, Crockett's listing of Thampi as a witness could not constitute protected activity by Thampi since Thampi did not engage in any activity at all. Furthermore, Thampi did not have any intent to speak. Therefore, the plaintiff cannot base a First Amendment retaliation claim upon Crockett's listing of him as a witness without his knowledge (and even if he could, the claim would fail for other reasons soon to be discussed).

The plaintiff has said that Crockett told him on the day before he received his pre-termination letter of January 30, 2007, that she had filed a

-13-

discrimination complaint and listed him as a witness (Doc. 59-4, p. 21). Arguably, this meeting could have produced protected speech, although the plaintiff does not clearly develop any such contention. Moreover, when asked by Crockett if he had any objections to being a witness, Thampi testified that he "went ahead and said, yeah" and told Crockett to "try to leave me out of this because – self preservation" (Doc. 59-8, pp. 15-16). Under these circumstances, there is plainly a legal question whether the plaintiff had engaged in protected speech at the time the termination process began. It is unnecessary to explore that issue, however, because the First Amendment retaliation claim regarding termination fails on other elements.

The Eleventh Circuit has recognized a four-step test to determine whether a public employer has retaliated against an employee for that individual's exercise of the right to free speech. Those four inquiries are: (1) whether the speech may be "fairly characterized as constituting speech on a matter of public concern"; (2) if so, whether the employee's First Amendment interests outweighed the interest of the employer in preserving the efficiency of government services; (3) whether, in that event, the employee's expression was a substantial motivating factor in the government's discharge decision;

-14-

and (4) if the employee has made such a showing, whether the public employer can prove that it would have taken the same employment action even in the absence of the protected conduct.  Brochu v. City of Riviera Beach, supra, 304 F.3d at 1157.

To fall within the scope of "public concern," the employee's speech must relate to a matter of political, social, or other concern to the community.  Connick v. Myers, 461 U.S. 138, 146 (1983).  A fundamental question in making this assessment is whether the employee was speaking as a citizen on behalf of the public, or to further his own private interests.  Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993), cert. denied, 512 U.S. 1221 (1994). This requires an analysis of the content, form, and context of a given statement, as revealed by the whole record.  Id.  Additionally, since "an employee's speech will rarely be entirely private or entirely public," it is "the 'main thrust' of the employee's speech" that governs this determination.  Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000)(quoting Morgan v. Ford, supra, 6 F.3d at 755).

The Supreme Court has subsequently in Garcetti v. Ceballos, 547 U.S. 410 (2006), shed additional light on the law in this area.  The

Supreme Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421. Thus, "[i]n Garcetti, the Supreme Court emphasized that a public employee must speak both on a matter of public concern and as a citizen to be protected under the First Amendment." D'Angelo v. School Board of Polk County, Florida, 497 F.3d 1203, 1209 (11th Cir. 2007). Importantly, both of these factors are matters of law for the court to decide. See Boyce v. Andrew, 510 F.3d 1333, 1342 n.12 (11th Cir. 2007).

The plaintiff has the burden of proving as a threshold matter that he spoke as a citizen rather than as a public employee. Abdur-Rahman v. Walker, 567 F.3d 1278, 1281-82 (11th Cir. 2009). Where, as here, the employee's putative speech was not part of his official duties, "[t]he [Supreme] Court identified as relevant two factors that, considered in isolation, are not dispositive: first, whether the speech occurs in the workplace; and second, whether the speech concerns the subject matter of the employee's job." Id. at 1282.

The threshold requirement that an individual speak as a citizen, and not an employee, defeats the claim based upon the mere listing of the plaintiff on Crockett's complaint because, assuming by some stretch of the imagination, that the plaintiff spoke, he did so as an employee obligated to cooperate with the investigation. Similarly, the claim (if there is one) that the County retaliated against the plaintiff for speaking with Crockett the day before the pre-termination letter fails since, if the plaintiff was engaging in protected activity at all, he was doing so as an employee, and not a citizen.[3]

In addition, the plaintiff's First Amendment retaliation claim regarding termination cannot satisfy the requirement that speech be on a matter of public concern. Whether speech is on a matter of public concern is a question of law "readily susceptible to disposition on summary judgment." Ferrara v. Mills, 781 F.2d 1508, 1515 (11th Cir. 1986). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices." Connick v. Myers, supra, 461 U.S.

---

[3]The plaintiff spoke with HR investigators about the Crockett complaint on March 1. 2007 (Doc. 59-4, pp. 16-21). By that time, the plaintiff had been terminated. Obviously, that activity could not be the basis for a retaliatory termination.

at 146. As indicated, statements are analyzed based on the content, the form, and the context of the entire record. <u>Martinez</u> v. <u>City of Opa-Locka</u>, 971 F.2d 708, 712 (11th Cir. 1992).

Various considerations have been identified as pertinent to an assessment whether a statement involves a matter of public concern. Thus, the motivation for an employee's speech is relevant to the public concern inquiry. <u>Goffer</u> v. <u>Marbury</u>, 956 F.2d 1045, 1049 (11th Cir. 1992). In addition, the fact that the information may be of general interest to the public is not dispositive. <u>Morris</u> v. <u>Crow</u>, 142 F.3d 1379, 1381-82 (11th Cir. 1998). Whether the speech is publically disseminated, while not required, can be a significant factor in this analysis. <u>Morgan</u> v. <u>Ford</u>, <u>supra</u>, 6 F.3d at 754 n. 5. But even if the public had some interest, that would not be enough to sustain a First Amendment claim. "The fact that ... information may be of general interest to the public ... does not alone make it of 'public concern' for First Amendment purposes." <u>Morris</u> v. <u>Crow</u>, <u>supra</u>, 142 F.3d at 1381-82.

Thampi contends, in a conclusory manner, that he spoke "*not for his own personal benefit*, but to help ensure the equality in the treatment of all employees in the workplace" (Doc. 64, p. 3)(emphasis in original).

Moreover, at the hearing, Thampi argued that he agreed to testify because he was concerned about "rooting out racial discrimination" and "vindicating the civil rights of another."

However, Crockett's complaint was simply a personal grievance about an employment matter. Thampi's statements to Crockett occurred as a private conversation, in Thampi's office, and concerned the working conditions of his co-worker. Thampi was reluctant to participate and he even asked Crockett to "leave me out of this" (Doc. 59-8, p. 15).

Also, there is no evidence of a relevant public debate on racism at that time among County employees. Moreover, the grievance investigation was not a matter that was open to the public. Further, the plaintiff did not attempt to engage the public on the issue. Morgan v. Ford, supra.

These circumstances establish that Crockett's grievance was not a matter of public concern. Indeed, it is doubtful that the public would even have any interest in the matter. The fact that Crockett was alleging discrimination does not convert the personal employment grievance into a matter of public concern. Id. at 754-55. Moreover, an internal dispute does not become a matter of public concern simply because it involves the way a

-19-

public institution is managed. Ferrara v. Mills, supra, 781 F.2d at 1516. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case." Connick v. Myers, supra, 461 U.S. at 149.

Therefore, to the extent that the plaintiff was even speaking about Crockett's complaint prior to his termination, his First Amendment claim regarding termination fails at the threshold. Thus, he did not show that he spoke as a private citizen, and not an employee, and that his speech addressed a matter of public concern.

There is an additional reason why the plaintiff's claim fails. Even assuming the plaintiff spoke as a citizen on a matter of public concern when he agreed to be kept as a witness on Crockett's list, the plaintiff has not shown that the decisionmaker, Hochuli, knew about Crockett's claim, and the plaintiff's involvement in it, at the time of the termination. It is established, as well as obvious common sense, that, in an employment context, the decisionmaker must have known of an employee's protected activity before he can be found to have retaliated against the employee due to that activity.

See Mason v. Village of El Portal, 240 F.3d 1337 (11th Cir. 2001); Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799-800 (11th Cir. 2000).

The plaintiff asserts in his memorandum in support of his motion for partial summary judgment that "[d]efendant retaliated against Plaintiff by actually firing Plaintiff shortly after finding out Plaintiff was to be a witness against Defendant regarding Ms. Crockett's Complaint" (Doc. 60-2, p. 23). That argument, however, contains no evidence showing that Hochuli was aware of the plaintiff's connection to Crockett's complaint. Rather, the County has presented evidence demonstrating that no reasonable juror could find that Hochuli had such knowledge.

On February 2, 2007, after the plaintiff had been given his pre-termination notice, Hochuli received a memorandum from Dale Garcia of the HR department that a discrimination complaint had been filed by an employee in his department (Doc. 59-4, p. 14). The memorandum provided no factual information about the complaint and did not even name Crockett, Thampi, or Hochuli (id., pp. 14-15). The memorandum pointed out that investigations into discrimination are confidential, and department directors, as well as

others, were told not to ask for evidence regarding the investigation (id., p. 14). Moreover, Garcia testified to the procedures that are undertaken to keep the complaints confidential (Doc. 59-10). Hochuli stated that he never saw Crockett's complaint and that he knew about Thampi as a witness when the investigator's final report of June 5, 2007, came out (Doc. 59-7, p. 11).

Crockett's complaint was dated January 19, 2007 (Doc. 59-4, p. 7). The pre-termination notice was delivered on January 30, 2007, and Hochuli said he spent a couple of days preparing it (id., p. 7). Thus, Hochuli had decided to fire the plaintiff before he received notice on February 2, 2007, that a discrimination complaint had been filed. And even then, the memorandum did not connect either Hochuli or the plaintiff to the complaint. In light of this evidence, no reasonable juror could conclude that Hochuli decided to terminate the plaintiff because he had been listed as a witness on Crockett's complaint.

Thampi speculates that, because the HR department and the County Administrator were aware of Crockett's complaint, "a strong inference can be drawn" that the information was leaked to Hochuli prior to the issuance of the pre-termination letter (Doc. 60-2, p. 24). There is no

evidence of such a leak. Moreover, in light of the procedures that were designed to keep the complaint confidential, there is no basis for speculating that there was a leak.

The plaintiff also attempts to escape this deficiency by referring to the County, in general, as the terminating force, so that the knowledge of the County Administrator and the HR department about the complaint is imputed to it (id., p. 25). However, the proper focus is on the actual decisionmaker, who in this case was Hochuli. See Brungart v. BellSouth Telecommunications, Inc., supra, 231 F.3d at 799-800. Thus, knowledge that the plaintiff was identified as a witness on Crockett's complaint cannot be ascribed to Hochuli simply because the County Administrator and certain people in the HR department were aware of it.

Similarly meritless is the plaintiff's assertion that Hochuli acted in "haste to get rid of Plaintiff as retaliation for testifying against Defendant" (Doc. 60-2, p. 25). Of course, by the time the plaintiff had given his statement on March 1, 2007, he had already been finally terminated. Furthermore, if Hochuli had been aware of the plaintiff being listed as a witness on Crockett's complaint, and was concerned about what the plaintiff

would say, his most likely course would have been not to fire the plaintiff since that would create animosity toward himself.

In sum, the evidence establishes that Hochuli did not know that the plaintiff had been listed as a witness on Crockett's complaint. The plaintiff has not adduced any evidence to the contrary. Accordingly, this is an additional basis for rejecting the plaintiff's First Amendment retaliation claim regarding termination.[4]

B. In September 2007, less than a month after filing this lawsuit, Thampi was offered a conditional position with Sarasota County by Jody Kirkman pending a background check. After gathering Thampi's employment records and speaking with Thampi's references, Kirkman rescinded the offer.

The plaintiff alleges that, "in further retaliation for Plaintiff having exercised his First Amendment rights for being a witness described, supra, officials of Defendant used derogatory, false, and/or distorted

---

[4]The County also makes a conclusory argument that Hochuli would have made the same decision even assuming a retaliatory animus (Doc. 59, pp. 18-19). Because the argument was not adequately developed, and the claim fails on several other grounds, evaluation of the argument is not warranted.

information designed to derail Plaintiff's job offer with Sarasota County" (Doc. 39, pp. 7-8). There is no probative evidence supporting this claim.

To begin with, there is no temporal proximity between the plaintiff's statement on March 1, 2007, and Kirkman's contact with the County in September 2007. See Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006)(three-month proximity between protected activity and adverse action is insufficient to show causation). Furthermore, Hochuli, the alleged retaliator, had no contact with Sarasota County since he was in Iraq. Also, Crockett's complaint was resolved with a finding of no race discrimination (Doc. 59-4, p. 50). Under these circumstances, there is no basis for an inference of a retaliatory animus.

In addition, Kirkman talked about the plaintiff with two individuals at Manatee County, John Zimmerman and Don Gray. During their depositions, no testimony was adduced indicating that they knew about Crockett's grievance or the plaintiff's involvement with it (see Doc. 59-9, p. 7; Doc. 59-11, p. 10). Further, there was no such evidence from any other source. Accordingly, the evidence does not support a finding that Gray and Zimmerman responded to Kirkman's inquiries with a retaliatory animus.

For these reasons, a rational jury would not find that the County retaliated against the plaintiff because he was a witness in connection with Crockett's complaint.

In the plaintiff's response to the County's summary judgment motion, the plaintiff comments near the end that the County provided disparaging information about the plaintiff in retaliation for filing this lawsuit (Doc. 64, pp. 19, 20).

The plaintiff, however, did not allege in the third amended complaint that the County retaliated against him for filing the lawsuit (Doc. 39). The plaintiff only alleged that the County retaliated against him for being a witness. Consequently, the plaintiff has not properly alleged a retaliation claim based upon the filing of the lawsuit. See Financial Security Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007).

At the hearing, the plaintiff sought to overcome this deficiency on the ground that the motion for leave to file the third amended complaint indicated that the amended complaint would allege a retaliation claim based on the filing of this lawsuit. Even if this were true, it would not suffice to remedy the deficiency; it is what is alleged in the complaint that counts, and

not what the motion for leave to amend proposed. In fact, however, the plaintiff's assertion regarding the content of the motion for leave to amend is not true. There is nothing in that motion that requests leave to amend to add a retaliation claim based upon the filing of the lawsuit (Doc. 35).

Furthermore, the plaintiff did not develop any argument supporting a claim of First Amendment retaliation due to the filing of the lawsuit. Thus, the plaintiff made no attempt to set forth facts showing he satisfied the elements of such a claim. Consequently, even if the plaintiff had alleged a retaliation claim based upon the filing of this lawsuit, it would be deemed abandoned due to lack of development.

In all events, the evidence does not support a claim of First Amendment retaliation predicated on this lawsuit. Thus, Zimmerman and Gray testified that, at the time they spoke with Kirkman about Thampi's employment history, they did not know about Thampi's lawsuit (Doc. 59-9, p. 7; Doc. 59-11, p. 10). The plaintiff provides no evidence to the contrary. Accordingly, Zimmerman and Gray would not have a basis for engaging in retaliation because they did not know of the lawsuit.

The plaintiff also relies upon a September 2007 Google search highlighting Thampi's civil rights suits. The printout was found in the file Kirkman had concerning Thampi. However, the file contained information from Sarasota County, as well as the public employment records requested from Collier County and Manatee County (Doc. 59-15, p. 13).

The plaintiff speculates that someone from Manatee County conducted the Google search and gave it to Kirkman to retaliate against the plaintiff for filing the lawsuit (Doc. 64, p. 21). The plaintiff has no significant probative evidence to support the speculation. Moreover, Kirkman believed that the search was performed by someone from the HR department of Sarasota County, although he was not sure (Doc. 59-15, pp. 10, 11). He did say further that the Google search document was found among the materials from Sarasota County (id., p. 11).

The plaintiff contends that Kirkman testified that the Google search was the "first page" of Thampi's employment file that Manatee County gave to him (Doc. 60-2, p. 12). However, in my reading of his testimony, Kirkman was referring to the first page of the exhibit plaintiff's counsel was showing him at the deposition, not the location of the Google search in his

records (Doc. 59-15, p. 10). In any event, even if Kirkman's testimony is read to say that the Google search was the first page of the materials, that would not establish that the search came from some anonymous person at Manatee County, since Kirkman said that the search document was among the papers from Sarasota County. In sum, the Google search was most likely conducted by the Sarasota HR department, as Kirkman believed; it is only conjecture to think that it was conducted by the Manatee County HR department.

The Google search does not support the plaintiff's retaliation claims not only because the plaintiff has no probative evidence that the search was conducted by someone with Manatee County, but also because there is no causal connection between the search and Kirkman's withdrawal of the plaintiff's conditional job offer.

Kirkman testified that he rescinded the offer of employment due to the poor performance evaluations, including "problems that actually occurred in the day-to-day activities or how he managed staff" (id., p. 5). Kirkman explained (id., p. 4):

> This position requires limited supervision. It's actually in a satellite location from where I am located. That being said, I needed an individual

-29-

that could perform. I was really concerned after I started getting into both reference checks and just looking at the information we got from Collier and Manatee. I felt this incumbent may have not performed in the manner we needed in that position. And again, it was performance based at that point.

Kirkman also stated (id.):

Basically he met the position technically. We had moved forward to the point of starting to check references. Once we got into the reference checks and a little more research, it basically pulled us back from offering the position.

Notably, Kirkman testified that he first became aware of the lawsuit approximately six weeks before he was deposed (id., p. 6). Consequently, it could not possibly have factored into Kirkman's decision not to hire Thampi. That statement is consistent with Kirkman's testimony that Gray and Zimmerman did not tell him about the lawsuit (id., p. 13). There is thus no evidence that raises a genuine issue of fact about whether Kirkman had knowledge of the lawsuit. See Daniels v. Hale, 2009 WL 3418586 at *5 (11th Cir. 2009)(unpub. dec.).

The plaintiff attempts to discredit Kirkman's testimony about the reasons he rescinded the offer on the ground that Zimmerman and Gray

testified at depositions that they did not give Kirkman a negative report of Thampi's performance (Doc. 64, p. 19). Kirkman did not articulate in his deposition any specific negative performance comments from Zimmerman and Gray, but did recall that both said they did not supervise the plaintiff (Doc. 59-14, p. 5).

The negative report on the plaintiff's job performance would have come not from Zimmerman and Gray, but from the plaintiff's personnel file that was requested by Sarasota County under Florida's public records act. That file contained a number of adverse assessments, including the detailed pre-termination notice (see Doc. 59-3, pp. 23-25). Kirkman testified further that he received records from Collier County that had negative information about the plaintiff's performance, and that he also took that information into consideration in deciding whether to complete the hiring process for the plaintiff (Doc. 59-15, p. 14).

In sum, the plaintiff's claim that the County retaliated against him by sabotaging his Sarasota job as result of his filing of this lawsuit fails for a number of reasons. Thus, such a claim was not pled; it was not developed in the plaintiff's memoranda; the plaintiff has failed to show a

causal connection between the withdrawal of the job offer and the filing of the lawsuit; and Kirkman explained that he withdrew the job offer based upon the information in the plaintiff's personnel files from Manatee and Collier Counties.[5]

For the foregoing reasons, the theories upon which the plaintiff predicates his First Amendment retaliation claim are not viable. Accordingly, count II will be dismissed.[6]

---

[5]Thampi also claimed that he lost jobs in several other counties on account of poor references from Manatee County in retaliation for his alleged protected activities. Thampi contends that he received verbal offers from Pompano Beach, DeSoto County, and Palm Beach Department of Health, that were "quickly withdrawn after a background/reference check with Defendant Manatee County" (Doc. 60-2, p. 4). The third amended complaint only alleges the job loss with Sarasota County, and does not allege the withdrawal of offers by any other counties (Doc. 39). Consequently, no claim has been raised with respect to job withdrawals by any counties other than Sarasota. Furthermore, unlike the Sarasota County claim, no facts were developed regarding job withdrawals by other counties. Therefore, even if the claim had been properly raised, it would be deemed abandoned.

[6]The plaintiff continues to complain of the termination proceedings, and asserts that those proceedings amounted to retaliation by the County (Doc. 60-2). Those proceedings have previously been considered and found to have satisfied due process (Doc. 40). Consequently, the plaintiff's continued complaints about the proceedings add nothing to his retaliation claims.

The plaintiff also complains in his memorandum about workplace harassment (Doc. 60-2, pp. 18-23). There is no allegation in the third amended complaint which even remotely suggests such a claim. Accordingly, the plaintiff's assertion of harassment is irrelevant.

The plaintiff asserts further that he was not afforded the "luxuries" others in a pre-termination status were afforded (Doc. 61-2, pp. 23-28). To the extent that he is complaining that he did not receive pay for the days spent in that status, the claim fails because, again, it was not alleged in the third amended complaint. Further, it was not

IV.

The plaintiff claims next that the "[d]efendant's actions/behavior violated Title VII of the Civil Right Act of 1964 when it retaliated against plaintiff" (Doc. 60-2, p. 32). Under Title VII, it is unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. 2000e-3(a).

The plaintiff has not presented any direct evidence of retaliation. Rather, he is apparently proceeding with his claim using the framework outlined in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973). To establish a *prima facie* case of retaliation under that approach, the plaintiff must show that: (1) he engaged in protected opposition to Title VII

---

meaningfully developed in the memorandum. For example, the plaintiff fails to identify the decisionmaker regarding lack of pay. Of course, if it was Hochuli, it has already been shown that, due to lack of knowledge of the Crockett complaint, he did not act with a retaliatory animus. In addition, the purported comparator's situation is not nearly identical to the plaintiff's (<u>see</u> Doc. 60-2, p. 27). Thus, the purported comparator received three days pay for the period between his pre-termination notice and the pre-termination meeting (<u>id</u>.). The plaintiff received the pre-termination notice, and the pre-termination meeting was held at that time.

discrimination or participated in an activity protected by Title VII; (2) he suffered an adverse action; and (3) there is a causal connection between the protected activity and the adverse action. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

A. The plaintiff claims that the County retaliated against him when he was listed as a witness and when he testified (Doc. 60-2, p. 35). The plaintiff asserts a number of adverse actions as a result (id., p. 34). However, the only actions that are arguably viable (see fn. 6), are the termination and the withdrawal of a job offer by Sarasota County.

The plaintiff claims that he was retaliated against for participating as a witness "pursuant to an investigation ... intended in part to ensure that the rights of a fellow employee ... were protected against discrimination ... under Title VII" (Doc. 60-2, p. 32). As the defendant correctly points out, the participation clause is unavailable to Thampi in this situation (Doc. 59, p. 20).

In the Eleventh Circuit, an act of "participation" requires the existence of a Title VII proceeding or investigation. EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000); Clover v. Total Sys. Servs.,

Inc., 176 F.3d 1346, 1353 (11th Cir. 1999); Van Portfliet v. H & R Block Mortg. Corp., 290 Fed. Appx. 301, 303 n. 2 (11th Cir. 2008). Thus, the participation clause protects proceedings that occur in conjunction with, or after the filing of, a formal charge with the EEOC. EEOC v. Total Sys. Servs., Inc., supra, 221 F.3d at 1174. The County's investigation into Crockett's claim began pursuant to internal policy and was not conducted as part of an investigation of an EEOC claim. Accordingly, the plaintiff's participation in an internal investigation prior to a formal complaint with the EEOC does not fall within the scope of the participation clause. Furthermore, at the time the pre-termination notice was given to the plaintiff, he had not even participated in an in-house investigation.[7]

A claim brought under the opposition clause, on the other hand, does not require the initiation of a Title VII proceeding or investigation. Rollins v. State of Fla. Dep't. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989)(per curiam). The Supreme Court held in Crawford v. Metropolitan

---

[7]The issuance of the pre-termination letter is the point at which Hochuli decided to fire the plaintiff. Thus, the plaintiff must show that, at that point, Hochuli had a retaliatory animus. In any event, the plaintiff had not even participated in an in-house investigation by the time of the final notice of termination.

Govt. of Nashville and Davidson Cty., ___ U.S. ___, 129 S.Ct. 846, 852-53 (2009), that an employee may engage in a protected activity under the "opposition" clause of Title VII even if the employee does not initiate a complaint of discrimination, but instead indicates opposition to an act of discrimination in the process of responding to questions from the employer during an investigation initiated by a co-worker.

The plaintiff contends that simply being listed as a witness in a co-worker's internal discrimination complaint is "opposition" (Doc. 60-2, p. 35; Doc. 64, p. 7). However, "[e]ven under Crawford, the plaintiff must communicate *something* to the employer that indicates an opposition to some employment action that could be construed as discriminatory." Fields v. Locke Lord Bissell & Liddell LLP, 2009 WL 2341981 (N.D. Ga. 2009)(emphasis in original). As indicated, the plaintiff had not said anything to the County about Crockett's complaint at the time the pre-termination notice was issued, or even by the time of the final termination notice. Consequently, the plaintiff's listing as a witness does not fall within the scope of the opposition clause.

The plaintiff therefore has failed to show that his being listed as a witness on Crockett's complaint is protected activity under Title VII. This defeats a retaliation claim under Title VII based upon Crockett's complaint.

In addition, the plaintiff has not shown a causal connection between the termination and being listed as a witness. As explained in connection with the First Amendment retaliation claim, there is no evidence that the decisionmaker, Hochuli, was aware of Crockett's complaint, or the plaintiff's connection with it, by the time of the plaintiff's termination. Because the plaintiff did not establish a causal relationship between his involvement with Crockett's complaint and his termination, he has failed to establish a *prima facie* case of retaliation based upon that involvement.

Furthermore, even if the plaintiff did present a *prima facie* case of Title VII retaliation with respect to his termination, the claim would still fail under the McDonnell Douglas test. See Chapman v. AI Transportation, 229 F.3d 1012, 1024 (11th Cir. 2000)(en banc). Thus, the County has articulated a legitimate non-retaliatory reason for the termination: The plaintiff's work performance was unsatisfactory to Hochuli. The plaintiff, in response, has not demonstrated that this reason is pretextual.

As the County correctly points out, the plaintiff was required to meet the County's articulated reason head on and rebut it. Id. at 1030. The County has presented the plaintiff's personnel file which reflects a number of job deficiencies recorded by Hochuli, as well as some misuse of a computer (Doc. 59-3). Notably, this is not a case like many others where the employee had been receiving good to excellent job reviews and then, all of a sudden after some purported protected activity, a very bad review is set forth. Here, Hochuli recorded less than favorable reviews throughout the plaintiff's tenure with the County. Moreover, the pre-termination notice stated in detail the reasons for Hochuli's dissatisfaction with the plaintiff's performance. The plaintiff has not adduced any evidence that would support a finding that Hochuli did not honestly believe that the plaintiff's job performance was unsatisfactory. See Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997).

It is insufficient for the plaintiff to argue that he was successful in obtaining unemployment benefits (Doc. 64, p. 15). The issue as to those benefits, according to the plaintiff (id.), was whether he was discharged for misconduct. Hochuli discharged the plaintiff due to poor job performance, with misconduct (computer misuse) playing, at most, a small part.

Similarly, the plaintiff cannot demonstrate that Hochuli's reasons for discharging the plaintiff were pretextual by stating favorable comments from co-workers, such as Crockett (id., pp. 16-17). Those individuals did not supervise the plaintiff and thus were in no position to assess the plaintiff's work from Hochuli's perspective.

The plaintiff's comment that he went five months prior to the pre-termination notice without being written-up or scolded (id., p. 13) does not provide any support for a finding that Hochuli did not honestly believe the plaintiff's job performance was unsatisfactory. Indeed, the fact that the plaintiff thinks going five months without being written-up is something special reflects that he really does not understand what constitutes a good job performance.

Therefore, the arguments asserted by the plaintiff do not provide any basis for finding that the County's reason for the termination was pretextual. Consequently, that reason provides an additional ground for

concluding that the plaintiff's claim of Title VII retaliation concerning the termination lacks merit.[8]

B. With respect to the Title VII retaliation claim, the plaintiff hardly asserts any argument based upon the filing of this lawsuit. In his memorandum in support of his motion for partial summary judgment, the plaintiff limits his argument regarding Title VII retaliation to being a witness with respect to Crockett's complaint (Doc. 60-2, pp. 32-35). The only reference to the lawsuit in his memorandum concerning the Title VII claim relates to a contention regarding interference with mitigation of damages (id., pp. 38-40). The plaintiff briefly refers to the lawsuit in his opposition to the County's motion (Doc. 64, pp. 19-21). The plaintiff, however, has failed to provide any meaningful argument explaining why the County's challenge to a Title VII retaliation claim based upon the filing of this lawsuit should be

---

[8]In his memorandum, the plaintiff asserts, in a conclusory manner, other alleged adverse actions of workplace harassment, denial of luxuries in the pre-termination process, and unconscionable delays in the post-termination hearing process (Doc. 60-2, p. 34). For the same reasons that these contentions are not viable with respect to the First Amendment retaliation claim, they are not viable with respect to the Title VII retaliation claim either (see fn. 6, supra).

rejected. That failure justifies the conclusion that the plaintiff has abandoned such a claim of Title VII retaliation.

In all events, the claim should be dismissed essentially for the reasons why the similar First Amendment retaliation claim was dismissed. As previously explained, the plaintiff did not even allege in the third amended complaint a retaliation claim based upon this lawsuit. Furthermore, any such claim is properly deemed abandoned in view of the plaintiff's failure to develop any argument regarding the claim, as just discussed.[9]

In addition, as discussed above, the retaliation claim based upon the lawsuit fails on the merits. Thus, Zimmerman and Gray were not aware of the lawsuit when they talked with Kirkman, and Kirkman was not aware of the lawsuit when he withdrew the job offer. Consequently, there was not a causal connection between the filing of the lawsuit and the withdrawal of the job offer.

---

[9]It is appropriate to note at this point that the plaintiff does not even explain whether he views the Google search as an adverse action, or merely as evidence indicating that Kirkman was aware of the lawsuit when he withdrew the job offer. If it is the former, the plaintiff needed to show why the providing of accurate, public information constitutes adverse action under Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006), a conclusion that is not obvious to me.

-41-

Moreover, Kirkman stated that he withdrew the job offer based upon information he obtained from the plaintiff's personnel files at Manatee and Collier Counties that showed unsatisfactory job performances. This evidence was not refuted, and it also negates a conclusion that the job was withdrawn due to the filing of the lawsuit.

For the foregoing reasons, the plaintiff's Title VII retaliation claim fails. Accordingly, count III will be dismissed.

It is, therefore, upon consideration

ORDERED:

1. That the defendant's Motion for Summary Judgment (Doc. 59) is hereby **GRANTED**, and counts II and III of the plaintiff's third amended complaint are hereby **DISMISSED**.

2. That the plaintiff's Motion for Partial Summary Judgment (Doc. 60) be, and the same is hereby **DENIED**.

3. That the Clerk shall enter judgment **DISMISSING** this case and, thereupon, **CLOSE** the case.

DONE and ORDERED at Tampa, Florida, this 9th day of November, 2009.

Thomas B. Wilson
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE